UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No.: 22-CV-483

| | |
|---|---|
| Abdiweli JAMA, | ) |
| | ) |
| Plaintiff, | ) |
| | )   COMPLAINT |
| v. | )   SEEKING |
| | )   MONEY DAMAGES |
| WRIGHT COUNTY, a municipal | )   DEMAND FOR |
| entity; WRIGHT COUNTY JAIL | ) |
| CORRECTIONAL OFFICER DOE, | )   JURY TRIAL |
| in their *individual* and *official* capacities; | ) |
| OFFICER MICHAEL PETERSON, in his | ) |
| *official* and *individual* capacity, | ) |
| MEND CORRECTIONAL CARE, PLLC; | ) |
| MELANIE HIRSCH; KIMBERLY GROB; | ) |
| AMANDA ROSS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>GENERAL INTRODUCTION</u>

1.    This is an action under 42 U.S.C. § 1983 seeking money damages as compensation for Defendants' violation of Plaintiff's constitutional rights as a pretrial detainee under the the Fourteenth Amendment to the United States Constitution. Plaintiff also seeks compensation for Defendants' violation of Plaintiff's constitutional right to be free from an unreasonable seizure under the Fourth Amendment.

2.    This action also states common law claims for battery and negligence pursuant to Minn. Stat. § 466.02.

3.      Plaintiff's claims against the unidentified Correctional Officers, referred to in this Complaint as C/O Does, are aimed at the C/O Does in their individual *and* official capacities (differentiated by claim).

4.      Plaintiff's claims against Wright County seek to hold the municipality responsible for the actions of its agents and employees which include but are not limited to Correctional Officers, hereinafter unidentified as C/O Does.

5.      Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343 and claim joinder is appropriate under Fed. R. Civ. P. 18.

6.      It is alleged that on February 20, 2021, and events in the subsequent days, one or more of Defendant Does, engaged in an action which resulted in the injury of Plaintiff and violated his constitutional right under the Fourth and Fourteenth Amendments to the United States Constitution.

7.      The moving forces behind Defendants' violations of Plaintiff's constitutional rights were: (A) the County's custom or practice of exhibiting deliberate indifference to use of unreasonable force by correctional officers at Wright County Jail to when arresting inmates for alleged or actual conduct violations, (B) the County's policy of only having a medical provider on site on Fridays, (C) the County's policy and/or custom of refusing to transport inmates to off-site medical providers for medical treatment of injuries that are not deemed to be life-threatening, (D) the County's policy of considering non-health-related grounds (e.g., cost of treatment, convenience, etc.) when considering whether to provide medical treatment to injured inmates, (E) MEnD Correctional Care's custom of misdiagnosing or

underdiagnosising the severity of physical injuries, (F) the County's policy to outsource all in-house medical care at the Jail to MEnD Correctional Care, and (G) failing to train correctional officers at Wright County Jail how to apply handcuffs in a manner that is not likely to cause serious bodily injury.

8.  Defendant Michael Peterson and/or Defendant Does committed a common law battery against Plaintiff for which Wright County must assume liability pursuant to MINN. STAT. § 466.02.

9.  Defendant Does breached their duty of reasonable care to (1) forgo fracturing Plaintiff's right arm by slamming handcuffs onto Plaintiff while Plaintiff was lying down and complying with commands, and (2) give reasonable and adequate medical aid for Plaintiff within a reasonable time period. Defendant Does breached this duty by never adequately diagnosing or treating Plaintiff's fractured arm for which they must assume liability pursuant to MINN. STAT. § 466.02.

## **PARTIES**

### **Plaintiff: Abdiweli Jama**

10. Plaintiff Abdiweli Jama [hereinafter "Jama" or "Plaintiff"] was an inmate imprisoned in Wrighty County Jail from November 11, 2020 to February 24, 2021.

11. Jama is a black man; he is a racial minority in Minnesota.

12. Jama is a 31-year-old man, originally from Somalia, living in the United States.

## Wright County Defendants

13.    Defendant Wright County is a local government unit of the state of Minnesota. In its capacity as a local government unit, it has implemented, executed, and adopted the policies relevant to this action.

14.    Wright County Jail Correctional Officer Michael Peterson ("Peterson") was at all relevant times a correctional officer at Wright County Jail. Defendant Peterson witnessed Plaintiff's wrist being broken.

15.    Jama does not yet know the true names, capacities, or exact number of Correctional Officer Defendants present sued herein as "C/O Does", and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege Defendant Does' true names and capacities when ascertained.

16.    Defendant Peterson and all individual Doe Defendants are sued in both their individual and official capacities with the distinction being made on a claim-by-claim and officer-by-officer basis.

17.    For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Defendant Peterson and Doe Defendants are sued in their *individual* capacity. While Plaintiff also faults Defendant Peterson and Doe Defendants for the actions they performed in their *official* capacity, these harms are imputed to the Wright County and need not be realleged.

18.    For purposes of Plaintiff's state law claims, Defendant Peterson and Doe Defendants are sued in their *official* capacity only.

19.  Plaintiff is informed, believes, and thereupon alleges that Defendant Peterson and/or Defendant Doe, in addition to the other named Defendants, is/are factually and proximately responsible for the damages and injuries alleged herein.

20.  Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Peterson and Defendant Doe were the agent, servant, and employee of Wright County and was acting at all times within the scope of agency and employment and with the knowledge and consent of their principal and employer.

21.  At all relevant times, Defendant Peterson and/or Defendant Doe were acting under color of state law.

## MEnD Correctional Care Defendants

22.  Defendant MEnD Correctional Care, PLLC is a Minnesota business entity with a Registered Office Address of 67 – 10th Ave. S., Waite Park, MN 53687 and a Principal Executive Office Address of 1908 Kruchten Court S., Sartell, MN 56377. MEnD Correctional Care is performing the functions of a state/municipal or quasi-state/municipal actor by providing medical services to incarcerated individuals in the care of Wright County Jail (and numerous other county jails across Minnesota).

23.  Defendant Todd Leonard ("Leonard") is the Registered Agent and Manager of MEnD Correctional Care, PLLC. Leonard alleges that he is a Doctor of Medicine. As the Manager of MEnD Correctional Care, PLLC, Leonard is responsible for supervising and controlling the actions of his employees.

24. On January 21, 2022, Minnesota's State Medical Board suspended indefinitely Leonard's license after finding that Leonard "demonstrated a willful or careless disregard for the health, welfare or safety of the patient, whom it did not name." *See* Kirsti Marohn, *MN Board Suspends Medical License of Jail Doctor*, MPR NEWS (Jan. 26, 2022), https://www.mprnews.org/story/2022/01/26/board-suspends-medical-license-of-jail-doctor.

25. Defendant Mend Correctional Care is now based in Sartell, Minnesota, and contracts with Wright County to provide medical care to all of its inmates.

26. Defendant Melanie Hirsch is a Minnesota Registered Nurse (License # 1845730) since 6/06/2008, and is and was employed by Defendant Mend Correctional Care at all relevant times for the events described herein.

27. Defendant Kimberly Grob is a Minnesota Register Nurse (License # 2071338) since 5/09/2012 and a Minnesota Certified Nurse Practitioner (License # 4433) since 3/04/2016, and is and was employed by Defendant Mend Correctional Care at all relevant times for the events described herein.

28. Defendant Amanda Ross is a Minnesota Certified Physician Assistant (License # 11724) since 11/08/2014, and is and was employed by Defendant Mend Correctional Care at all relevant times for the events described herein.

29. All individual Doe Defendants are sued in both their individual and official capacities with the distinction being made on a claim-by-claim and officer-by-officer basis.

30.  For purposes of Plaintiff's claims under 42 U.S.C. § 1983, all MEnD Correctional Care Defendants (including employees) are sued in their *individual* and *official* capacities.

31.  To the extent that MEnD Correctional Care Defendants are deemed municipal employees as state or quasi-state actors, the harms they caused while performing their duties in their official capacity are imputed to the Wright County and need not be realleged.

32.  To the extent that MEnD Correctional Care Defendants are *not* deemed municipal employees as state or quasi-state actors, the harms they caused while performing their duties in their official capacity are *not* imputed to the Wright County and are fully realleged by incorporation.

33.  For purposes of Plaintiff's state law claims, MEnD Correctional Care Defendants are sued in their *official* capacity only.

34.  Plaintiff is informed, believes, and thereupon alleges that one, some, and/or all MEnD Correctional Care Defendants, in addition to the other named Defendants, is/are factually and proximately responsible for the damages and injuries alleged herein.

35.  Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, all MEnD Correctional Care Defendants were the agents, servants, and employees of both MEnD Correctional Care *and* Wright County, and were acting at all times within the scope of agency and employment and with the knowledge and consent of their principals and employers.

## JURISDICTION

36.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 42 U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is appropriate as the events in question "derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## VENUE

37.  Venue properly lies in the District of Minnesota pursuant to 28 U.S.C. § 1391(e)(1) because all the events giving rise to this claim occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## The Fracturing of Jama's Right Arm

38.  On February 20, 2021, Jama was an inmate and imprisoned in and under the care of Wright County Jail, located in Buffalo, Minnesota.

39.  On February 20, 2021, at approximately 12:00 p.m., Jama was in the Oscar Room, a housing unit, eating lunch. Another inmate Alejandro Salomon, (hereinafter "Inmate Salomon") approached Jama and began arguing with Jama. After less than a minute, Jama stood up to leave Oscar Room, and proceeded to do so.

40.  Inmate Salomon then pushed Jama. Jama motioned to Inmate Salomon that he was leaving, gestured towards his cell stating that he was just going back to his cell; Jama told Salomon that Jama "didn't want any problems."

41.  Inmate Salomon continued following Jama. As they both reached Jama's cell, a physical altercation occurred.

42.    Jama and Inmate Salomon fought and were approximately 15 yards away from Correction Officer and Defendant Michael Peterson.

43.    C/O Peterson immediately called for backup, and then an unknown number of corrections officers arrived to assist.

44.    While Inmate Salomon was physically on top of Jama, Correction Officer Doe (hereinafter "C/O Doe") and another C/O Doe sprayed Jama and Inmate Salomon with mace.

45.    Jama's eyes began to burn immediately.

46.    C/O Doe instructed Jama and Inmate Salomon to "get down." Jama complied. He turned over, assumed a stomach-down position with his arms and legs spread out.

47.    C/O Doe instructed Jama to stay down. Jama complied.

48.    C/O Doe then grabbed Jama's right arm while he was stomach-down, and twisted it behind his back as C/O Doe slammed handcuffs on Jama's right arm.

49.    The force that CO Doe used while handcuffing Jama was so immense that it immediately fractured Jama's right arm, resulting in such a degree of pain that Jama defecated on himself. This all occurred while Jama was stomach-down, complying, not resisting, and stating "I'm not resisting."

50.    Jama was handcuffed with his hands behind his back.

51.    Dated February 20, 2021, a Disciplinary Action Report (hereinafter, "DAR") was submitted, C/O Peterson being listed as the witness, which stated that Inmate Salomon was taken to the emergency room after receiving a cut on his forehead above his left eye and below his hairline.

52. The DAR also described that Jama suffered "bruising on his head and possible *fracture* on his arm." (emphasis added).

53. The DAR described the severity of Jama's alleged "failure to follow staff directive" as "minor."

54. None of the reports that were disclosed to Plaintiff subsequent to Plaintiff's Open Data Request that was filed with Wright County disclosed the name of the C/O Doe who was responsible for breaking Plaintiff's arm.

55. It does not appear that C/O Doe ever wrote a report about his use of force or arrest of Plaintiff.

56. Defendants acted unreasonably and without due process by punishing Plaintiff by breaking his arm as punishment for a "minor" infraction.

57. Defendant Doe and/or Defendant Peterson violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure of his person by using excessive force while arresting Plaintiff and thereby causing Plaintiff's bone to fracture.

## Lack of Medical Care Immediately After Jama's Bone Fracture

58. Immediately after fracturing Jama's right arm, Defendant Doe(s) and/or Defendant Peterson lifted Jama up by his armpits while being handcuffed.

59. Jama could not see because of the mace still on his face and body, which was painful and still burning.

60. Defendant Doe(s) and/or Defendant Peterson assisted Jama to walk and brought him to the Hole Unit, Wright County Jail's solitary confinement unit. They walked Jama

for 2-3 minutes and took Jama directly to the shower to clean himself from the mace and feces on his body.

61.   Immediately following the incident, Jama's arm was limp and the pain began to settle in within 10 minutes as his adrenaline and shock began to subside. Jama's entire body was in pain from the burning of the mace and his fractured arm. Jama asked Defendant Doe(s) and/or Defendant Peterson if he could be taken to the emergency room, while showering. Jama had learned that Inmate Salomon was taken to the hospital and was simply requesting the same treatment.

62.   Defendant Doe(s) and/or Defendant Peterson did not reply to Plaintiff or take him to the hospital.

63.   Jama continued to ask to be taken to the emergency room, and also asked why they had used excessive force on him. Defendant Doe(s) and/or Defendant Peterson did not reply.

64.   Once Jama was done showering, Defendant Doe(s) and/or Defendant Peterson gave him distinct Hole Unit clothing and brought him to his cell within the Hole Unit. Jama continuously asked to be taken to the emergency room.

65.   Defendant Doe(s) and/or Defendant Peterson did eventually request a nurse to examine Jama.

66.   Approximately at 12:45 p.m., Registered Nurse Melanie Hirsch (hereinafter, "Nurse Hirsch") came to Jama's cell to evaluate him, and asked Jama what had occurred. Jama told Nurse Hirsch about the fight with Inmate Salomon, his resulting bruises and bumps on his head, the force that   Defendant Doe(s) and/or Defendant

Petersonused to handcuff Jama, and that his forearm was in severe pain. Jama told Nurse Hirsch that he "need[ed] to be x-rayed, to see if my arm is broken," that he was in tremendous pain, and that "I think my right arm is broken, why can't you take me to the ER because the other inmate was already taken to the ER why not me."

67.    Nurse Hirsch grabbed Jama's arm, physically examined it by pressing his forearm with her hand and probing his arm and stated, "there's nothing wrong with your arm, we're just going to get you an ice pack." Nurse Hirsch then left and only examined Jama for less than five minutes. Nurse Hirsch did not make any attempt to provide temporary relief by providing Jama with an arm sling or other methods to stabilize his arm and thereby prevent unnecessary and gratutitious pain and suffering.

68.    At 12:58 p.m., Nurse Hirsch entered an Inmate Note Report (hereinafter, "INR") stating: "[right] lateral forearm has small area of swelling noted, no bruising, very little pain noted with palpation, he states the pain is 10/10 then states his [right] hand is feeling numb. He then states his entire hand must be broken and is very painful, then he states his upper arm is very painful also, his hand, fingers and upper arm are all unremarkable, no swelling, bruising or signs of trauma. He is unable to move his fingers when asked. His Right upper forehead shows a small bump, he has a abrasion the size of a pea, he did not lose consciousness, he is unsure what he hit his head or his arm on. Will okay ice packs for now and recheck forearm tomorrow."

69.    At the time Nurse Hirsch examined Jama's arm, the break in Jama's arm was so clear and obvious that any person, medical professional or otherwise, would recognize that his arm was fractured simply.

70.    At 1:30 p.m. a Medical Provider Verbal/Telephone Pharmacy Order (hereinafter, "Pharmacy Order") was written. It stated that Jama would be given Tylenol 325mg, 3 tabs a day, 2 times a day. The Medical Provider was listed as Kimberly Grob, Family Nurse Practitioner (hereinafter, "NP Grob") which was signed my NP Grob. It was also signed by Nurse Hirsch.

71.    Approximately at 2:00 p.m., a correctional officer brought Jama an ice pack.

72.    Approximately at 3:00 p.m., Jama began conversing with C/O Doe through an intercom connected to his cell. Jama explained how much pain he was in and requested to see a sergeant or "whoever is in charge." C/O Doe told Jama that the sergeant "had left for the day" and that "there was no sergeant at the jail right now." C/O Doe also said that "the nurse will get to you when she's done with other inmates."

73.    Approximately at 4:00 p.m., a correctional officer brought Jama two 500mg Ibuprofen pills. Jama repeatedly told C/O Doe that his entire body was in pain because of the mace residue, his arm was in serious pain, and begged him to "please treat me like a human being with some dignity and take me to the emergency room so they can X-Ray my arm, because I can't use my forearm."

74.    Jama did not receive a response.

75. When Jama filed an Open Data request seeking copies of all of his medical and other grievances/kites/etc. that Wright County Jail had in its possession, it did not disclose the grievance that Jama filed this grievance, indicating it was intentionally destroyed by Defendants in an attempt to limit Defendants' civil liability.

76. Approximately at 8:00 p.m., C/O Doe brought Jama two 500mg of Ibuprofen.

77. Throughout the night, Jama exclaimed to C/O Doe, through the intercom, about his arm's throbbing pain and how he could not sleep due to it.

78. Jama did not receive a response.

### Jama's Lack of Adequate Medical Care *Days* After Arm Fracture

79. The following day, February 21, 2021, at approximately 8:00 a.m., a correctional officer brought Jama an ice pack and two 500mg Ibuprofens.

80. Later that morning, a sergeant came to visit and question Jama about his altercation with Inmate Salomon the day before. The sergeant wanted to record his statement of the event and asked him whether Jama wanted to press charges against Inmate Salomon. Jama told him no.

81. Jama then told the Sergeant about his arm and that he needed an X-Ray.

82. Sergeant Doe then examined his arm and said, "I think your arm is fractured."

83. Jama told Sergeant Doe that he needed to go to the emergency room, and the sergeant replied that the nurse "will make an appointment for you."

84. Later that day, Nurse Hirsch came to see Jama and told him that he had a medical appointment the following day and told him to keep icing his arm and that there was "nothing else we could do." It is unclear why Nurse Hirsch did not make any effort

to relieve Jama's pain and discomfort by providing him with a sling or other temporary support device.

85.   At 11:30 a.m., an X-Ray was ordered for the following day, on February 22, 2021. The order was signed by NP Grob, Nurse Hirsh, and Physical Assistant Amanda Ross (hereinafter, "PA Ross").

86.   At 11:38 a.m., Nurse Hirsch entered an INR stating: "Writer seen inmate for recheck of [right] lower arm earlier in his cell, he stated his arm 'really hurts and I got no medical care yesterday', writer advised he was looked at, given ice and Tylenol and he is being rechecked today. [Right] lower arm slight swelling noted today, no bruising seen anywhere, no swelling in upper arm or fingers. He states he is unable to rotate his arm or move his fingers. Pain level at 8/10. Per Provider Amanda Ross, PA-C obtain xray tomorrow of right arm and administer Ibuprofen 800 mg 3x per day per request x 7day."

87.   At 11:45 a.m., a Pharmacy Order was written for Ibuprofen 800mg, 4 tabs of 200mg, 3 times a day, for 7 days. The order was signed by PA Ross and Nurse Hirsch.

88.   On February 22, 2021, at approximately 2:00 p.m., C/O Does took Jama to the Alina Clinic in Buffalo, MN. Jama was seen by an X-Ray technician 2-3 minutes after arriving at the clinic.

89.   The X-Ray technician took two X-Ray photographs of Jama's arm. Jama asked if he could see the photographs. The technician said no, and that she would send the X-Rays to the jail.

90.   Jama repeatedly asked to see a doctor, but he did not receive any other assistance.

91.   The clinic's Medical Imaging Report (hereinafter, "MIR") indicated Jama's right arm had an "acute fracture of the distal ulnar diaphysis" that was "displaced . . . and proximally migrated," and that the fracture was "a 2.5 cm free fragment at the ulnar fracture margin."

92.   The MIR was electronically signed by Scott Nielsen, MD, and NP Ross was listed as the ordering physician.

93.   The MIR was promptly sent to NP Ross, Nurse Hirsch, PA Ross, or another Mend Correctional Care employee and added to Jama's medical file.

94.   There was no INR or Pharmacy Order written on February 22, 2021, even after the visit at the clinic.

95.   On February 23, 2021, Jama wrote an Inmate Request Form requesting to see the X-Rays, because he "was in a lot of pain and would like to see the cause since I'm being denied to see a real doctor. Your medical staff … is inhumane. The nurse isn't a real doctor and shouldn't prescribe, but refer clients to a real doctor." Responding staff responded by writing "the medication you were prescribed was from a real doctor. We can speak with the provider… we are working on setting up an appointment for this also."

96.   At 3 p.m., on February 23, 2021, a Pharmacy Order was written that prescribed Tylenol 325mg, 3 tabs, 3 times a day, for 6 days. The order was signed by FNP Grob and Nurse Hirsch.

97.   At 3:02 p.m., an INR was written by Nurse Hirsch stating: "Inmate requesting to change from Ibuprofen for [over the counter] pain control instead of [Ibuprofen],

will [decrease Ibuprofen] and change to Tylenol 325 mg 3 tabs oral 3x/day as needed x 6 days, inmate does have a fracture. Ok per [NP Grop]."

98.   Throughout this three-day period, Jama continuously asked for adequate medical treatment, to see a physician, and to see X-Ray MIR. He was denied all three requests repeatedly.

### Four Days After Fracture, Jama Was Finally Given Adequate Medical Treatment When Transferred to Another Jail

99.   On February 24, 2021, Jama was transported from Wright County Jail to the Minneapolis Federal Courthouse (for the unsealing of an indictment) before then being subsequently transported from Minneapolis to Sherburne County Jail. According to Google Maps, this circuit consists of nearly an hour and a half of driving and a distance of 78.5 round trip miles. During the entire drive, Plaintiff was placed into great pain with every bump in the road which jostled his broken arm, of which there were many due to poor winter driving and road conditions with numerous potholes.

100.   Defendants knew that Jama would be transported from Wright County Jail on February 24, 2021 before he was transported, yet made no effort to splint, cast, sling, or otherwise immobilize Jama's arm to guard against gratuitous pain and suffering during transport.

101.   Staff person Christian Amber wrote an INR, stating: [patient] is being released to another facility. He has an appointment at Twin Cities Orthopedics in Maple Grove

… for acute fracture of the distal ulnar diaphysis of the right wrist. Will send copy of note to [receiving] facility."

102.   Jama was in the US Marshalls Federal Building from approximately 12:00-3:00 p.m. From the federal building, Jama was to be transported to the Sherburne County Jail.

103.   While in the federal building's holding cell, Jama was handcuffed frontside with an additional ~5 lbs. chain connected to his arms. While in the custody of US Marshall Brian Smith ("Marshall Smith"), Jama told him that his arm was broken and in severe pain. Marshall Smith called ahead and told Sherburne County Jail to have someone ready to evaluate Jama.

104.   According to a Sherburne County Jail report, Aaron Daugherty (supervised by Melissa Burgess, FNP at Sherburne County Jail) called Wright County Jail on February 24, 2021 to get patient information. Wright County reported that Jama would be arriving unsplinted and "advised [Jama] was not seen by a provider at Wright County due to there only being a provider on site on Fridays."

105.   Upon arriving at Sherburne County Jail, FNP Burgess recorded that Jama "reports his arm was broken," "reports that he is having a lot of pain in his arm," "was calm and cooperative," "reports a 8/9 in pain on a scale of 0-10", and had "limited range of motion noted when patient attempt to lift right arm…patient noted to be grimacing while moving right arm."

106.   An hour after arriving at the Sherburne County Jail, FNP Burgess applied a large splint on his right arm, from his fingertips to past his elbow. FNP Burgess also

informed Jama that he had an orthopedic appointment the following day. Jama was also given Tylenol for his pain. The splint reduced Jama's pain and helped him manage it to the point where he was able to sleep throughout the night for the first time since his fracture.

107.   Considering how quickly FNP Burgess applied a splint to Jama's arm, it is unclear why this was not done by Wright County or Mend Correctional Care Defendants prior to Jama's transport.

108.   On February 25 at approximately 9:00 a.m. two Sherburne Corrections Officers transported Jama to the Twin Cities Orthopedics in Maple Grove, MN.

109.   Jama arrived at the Twin Cities Orthopedics at approximately 10:30 a.m. The technician asked how long his forearm had been in that condition and why it had not been treated before.

110.   The X-Ray technician photographed more pictures and showed Jama the fractures and the bone that was out of place in the X-Ray images. The technician photographed 4-5 images. The doctor then came and examined Jama's forearm and told him that they were going to place his arm in a cast. The nurse then came and immediately cast his arm.

111.   The doctor and nurse told Jama that he should have been treated before because his arm was visibly dangling.

112.   After his arm was cast, Jama was taken back to the Sherburne County Jail and was housed in the medical segregation unit. He was told by a Sherburne Correction Officer that he was placed in segregation, because he could use the cast as a weapon.

113. He was in the medical segregation unit from February 25, 2021 to April 5, 2021 where he was in confinement for 23 hours of the day for 40 continous days.

114. On April 5, 2021 Jama was transported to Twin Cities Orthopedics where his cast was removed. The doctor told Jama that his right arm had atrophied and the arm's use and functionality would be limited.

115. Jama's arm has not fully recovered. He has limited functionality of his arm, and regularly experiences pain.

### Jama Exhausted Administrative Remedies

116. After his injury, Jama promptly filed grievances to seek medical assistance and thereby exhausted his administrative remedies.

117. To the extent that Jama might not have exhausted his administrative remedies, he was not required to so exhaust because of events outside of Jama's control. For example, Jama was moved out of Wright County Jail and transferred to Sherburne County Jail just 4 days after the injury occurred, disallowing him the time needed to go through the entire grievance and grievance appeal process, even if a full administrative grievance and grievance appeal process was available.

118. Additionally, though Jama suspected his arm was fractured, there was no official diagnosis that was communicated to Jama until after he was transferred. Though Wright County Jail knew of Jama's diagnosis of a broken forearm, that information was not communicated to Jama directly while Jama was in Wright County Jail.

119.   After his forearm was broken, Jama had very limited use of his dominant arm during those four days between his injury and his transfer to Sherburne County Jail and writing legibly was incredibly difficult and painful for Jama.

120.   Even if Jama was somehow required to exhaust administrative remedies further, prudential concerns militated against further administrative action because Jama was terrified of being retaliated against and having his pain levels increased as a result. As it is, the extreme delay in giving Jama so much as some low-level painkilling medicine and a splint for his arm indicates that Wright County Jail was already in the process of retaliating against Jama simply for alleging that a correctional officer broke his forearm.

## INJURIES

121.   At minimum, the injuries Jama suffered rise to the level of "substantial bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.7a.

122.   The injuries Jama suffered also rise to the level of "great bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.8.

123.   Jama suffered significant damage to his right forearm as a result of Defendant Peterson and/or Defendant Doe(s) slamming handcuffs on Jama's arm while he was faced down on February 20, 2021.

124.   Both clinics that photographed X-Rays of Jama's right forearm confirmed the fracture and displacement of bone following the February 20, 2021 event. This was not a preexisting injury.

125. Following the aforementioned X-Rays, Jama was confirmed to an acute fracture of the distal ulnar diaphysis, with a 2.5 cm free fragment at the ulnar fracture margin. The distal ulnar was displaced and had migrated following the February 20, 2021 event.

126. Jama underwent additional and prolonged pain, suffering, and trauma due to the inadequate medical care the approximately four-day period following the February 20, 2021 event.

127. As a result of the February 20, 2021, after receiving adequate medical treatment in form of a cast on his arm, Jama was involuntarily placed in solitary confinement for over one month due to the hypothetical possibility that the cast could be used as a weapon. This further caused trauma, physical and mental anguish, and muscle atrophy. These harms were foreseeable and directly attributable Defendant Peterson's and/or Defendant Doe's(s) actions in breaking Jama's forearm.

128. To this day, Jama still suffers from pain and limited functionality of his right arm due to muscular atrophy because of the injury caused by Defendants.

129. Jama's arm still has a bump in it, and the arm remains somewhat crooked.

130. Jama's pinky on his injured arm also is not straight.

131. Jama's injured arm continues to hurt when it is cold, which is often in Sherburne County Jail.

132. Jama is continuing to experience weight-bearing issues with his arm. When he tries or is forced to put any significant amount of weight on his injured arm, he quickly

begins feeling pain, and this pain increases in orders of magnitude as the weight bearing activity increases in duration or intensity.

133.   Minnesota courts have well established that "[w]here a tort is committed, and injury may reasonably be anticipated, the wrongdoer is liable for the proximate results of that injury, although the consequences are more serious than they would have been, had the injured person been in perfect health." *Ross v. Great N. Ry. Co.,* 111 N.W. 951, 953 (1907).

134.   Defendants are therefore liable for the real physical injuries caused by initially fracturing Jama's arm, for the injuries that resulted from subsequently failing to provide adequate medical care, and from the injuries that were proximately caused by the foregoing.

135.   This injury and physical and mental trauma sent Jama into a prolonged depressive state where he suffered from loneliness and the struggles of recovery while in solitary confinement.

136.   Jama has suffered extreme emotional distress and depression, in the form of pain and suffering, as a result of Defendants' intentional actions.

## CLAIMS FOR RELIEF

137.   Defendants' deliberate indifference to Jama's medical needs violated his Fourteenth Amendment rights to substantive and procedural due process, and further violated his Fourteenth Amendment right to be free from cruel or unusual punishment as a pretrial detainee.

138. Defendants' unreasonable seizure of Jama's person and use of excessive force during that seizure violated Jama's Fourth Amendment rights.

139. Defendant Wright County's policies and customs of encouraging and tacitly approving of and otherwise exhibiting deliberate indifference to the constitutional violations of its employees or agents were the moving force behind Defendants' conduct in a manner sufficient for liability to attach under *Monell* and *Canton*. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978); *see also supra* ¶ 7(A)-(G) (elucidating specific unconstitutional policies and customs that led to Jama's injury).

140. Defendant Doe's unprompted, unnecessary, and unreasonable fracturing of Jama's right arm constitutes a common law battery under Minnesota tort law.

141. Defendant Doe's unprompted, unnecessary, and unreasonable fracturing of Jama's right arm constitutes negligence under Minnesota tort law.

142. All Defendants exhibited deliberate indifference to Jama's pain and suffering by refusing to splint his arm: (A) for four days after it was broken, (B) for two days after the break was confirmed by a third-party medical provider, and (C) before transporting Jama from Wright County Jail to Minneapolis and then subsequently from Minneapolis to Sherburne County Jail.

143. Defendant Peterson's and/or Defendant Doe's unprompted, unnecessary, and unreasonable fracturing of Jama's right arm and subsequent trauma constitutes negligent infliction of emotional distress under Minnesota tort law.

### Count 1: 42 U.S.C. § 1983 – Fourteenth Amendment Violation For Punishment Against A Pretrial Detainee

(Plaintiff v. Defendant Peterson, Defendant Doe(s), and all Mend Care Correctional Defendants)

144.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

145.   Jama, at all relevant events, was neither convicted of nor serving any sentence for a crime. Therefore, his status was that of a pretrial detainee– a person in custody while awaiting trial or sentencing.

146.   Prison officials may only subject pretrial detainees to restrictions and conditions of a detention facility, so long as they do not constitute punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Unlike the Eighth Amendment, which prohibits cruel and unusual punishment, the Fourteenth Amendment prohibits *all* punishment towards a pretrial detainee. *See id.*

147.   A punishment is an action or condition that is either (1) not "reasonably related to a legitimate governmental purpose or were excessive in relation that purpose," or (2) intentionally punitive.  *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020).

148.   If the condition or action is arbitrary or excessive in relation to an otherwise legitimate governmental goal, it is presumed to be punitive and a violation of the Fourteenth Amendment. *See id.* at 908 (citing *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

149.    There was no legitimate, penological governmental purpose is slamming handcuffs with such force as to fracture Jama's right forearm.

150.    Jama had already complied with commands to get down to the floor, face down, and was not resist the officers. There was no objective need for any force as Jama had already subdued himself abiding the officer's commands.

151.    Additionally, Jama did not threaten or resist the officers as he attempted to comply. There was no reason for the officers to feel threatened as any period of threatening behavior towards Inmate Salomon was over, as indicated by both inmates lying on the floor.

152.    Alternatively, even if there was a legitimate, penological purpose, the actions and conduct executed were objectively excessive and a Fourteenth Amendment violation.

153.    Outside of the commands given to Jama, which were complied with, there was no attempt whatsoever to temper the supposed severity of the situation or need of force. That is in due part, because Jama had already complied with all commands given to him by correctional officers.

154.    Defendant Peterson and/or Defendant Doe made no attempt to deescalate the situation or give any further instructions, and instead resorted immediately, and without warning, to the use of slamming handcuffs on Jama with such a high degree of force that it fractured his bone.

155.    As a result of Defendant Peterson's and/or Defendant Doe's fracturing of Jama's arm, he suffered insurmountable physical pain and eventual mental anguish due to being placed in solitary confinement as a direct result of his fractured arm.

156.    Additionally, the actions taken by Mend Correctional Care Defendants constituted both punishment and cruel or unusual punishment of a pretrial detainee.

157.    Mend Correctional Care Defendants punished Jama by refusing to splint or otherwise immobilize his arm for four days after it was broken and otherwise allowing him to be transported in a vehicle on multiple occasions despite knowing that the inability for Jama to immobilize his arm in these vehicles would wantonly inflict unnecessary pain and suffering.

158.    Jama suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

## Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation For Failure To Provide And Denial Of Adequate Medical Care

(Plaintiff v. All Mend Correctional Care Defendants and Wright County)

159.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

160.    Pretrial detainees are guaranteed a right to adequate medical care under the Fourteenth Amendment. *See Vaughn v. Greene Cty.*, 438 F.3d 845, 850 (8th Cir. 2006).

161.   Although rooted in the Fourteenth Amendment, a violation of a pretrial detainee's right to adequate medical care is analyzed under the deliberate-indifference standard governed by the Eighth Amendment. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)

162.   The deliberate-indifference is a two-prong test, an objective element and a subjective element.

163.   Under the objective prong, plaintiff must show that he suffered an "objectively serious medical need." *Id*. This can be evinced by a diagnosis of a physician requiring treatment *or* a condition or injury "so obvious that even a layperson would easily recognize the necessirty for a doctor's attention." *Id*. (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

164.   Under the subjective prong, plaintif must show that an official or medical person "actually knew of but deliberately disregarded his serious medical need." *Id*. To satisfy this prong, medical personnels' actions must be "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id*. (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1240-41 (8th Cir. 1997)

165.   When Jama's arm was fractured, his injury was so obvious to a layperson that Defendant Peterson, in his Disciplinary Action Report, wrote that Jama had a "possible fracture on his arm."

166.   In an addition, Jama repeatedly informed the correctional staff and Nurse Hirsch that his arm was broken.

167. On the same day that his arm was fractured, Nurse Hirsch input an INR note that stated: "[Jama] then states his entire hand must be broken and is very painful, then he states his upper arm is very painful also . . . [Jama] is unable to move his fingers when asked."

168. Both clinics that eventually examined Jama and took X-Rays of his arm, diagnosed his arm as fractured and commented that the fracture had also migrated, i.e. his arm was crooked.

169. The second clinic's doctor, even further noted that as soon as he saw Jama's arm, there was something obviously wrong due to its orientation.

170. FNP Grob was listed as the ordering physician for the initial X-Rays taken, which diagnosed a fracture and migration of Jama's arm. Defendants received these X-rays on February 22, 2021.

171. PA Ross and Nurse Hirsch also signed numerous pharmacy orders prescribing Ibuprofen for Jama's injury.

172. Nurse Hirsch and FNP Grob, had actual knowledge of Jama's fracture hours after the injury occurred.

173. FNP Grob, PA Ross, and Nurse Hirsch all had actual knowledge of Jama's fractured arm at the very latest by February 22, 2021, when the initial X-Rays were taken– yet *never* provided adequate medical care or treatment.

174. Mend Correctional Care Defendants provided inadequate medical care to Jama by refusing to splint or otherwise immobilize his arm for four days after it was broken and otherwise allowing him to be transported in a vehicle on multiple occasions

despite knowing that the inability for Jama to immobilize his arm in these vehicles would wantonly inflict unnecessary pain and suffering.

175. Jama did not receive adequate medical care until *after* he was discharged from the care of Nurse Hirsch, FNP Grob, and PA Ross.

176. Immediately upon arriving at Sherburne County Jail, Jama was able to have his arm splinted by on-site providers. This splinting provided significant temporary relief of Jama's pain, allowing him to sleep for the first time in four days. Wright County Jail could have provided the same relief, but chose not to.

177. Based on the officials' and medical personnels' actual knowledge of a serious medical injury, intentional or reckless disregard of it, and repeated refusal to provide adequate medical care, the deliberate-indifference test protecting pretrial detainees is met.

178. Moreover, all Defendants were subjectively aware that all Mend Correctional Care Defendants knew of his injury but deliberately disregarded the medical risk and risk of unnecessary pain and suffering associated with allowing Jama to remain without appropriate medical care.

179. Jama suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

180. Thus, Defendants violated the and Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 3: 42 U.S.C. § 1983 – Fourth Amendment Violation

(Plaintiff v. All Defendants)

181.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

182.   By breaking Plaintiff's wrist/forearm by applying handcuffs with excessive force while Plaintiff was immobilized on the ground and not resisting commands, Defendant Peterson and/or Defendant Doe violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures of his person.

183.   In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

184.   Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

185.   Plaintiff suffered serious harm as a direct and proximate result of Defendant Peterson's and/or Defendant Doe's actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

## Count 4: *Monell* and *Canton* Municipal Liability

186.   Wright County has the following official policies or customs:

a. Wright County has a custom or practice of exhibiting deliberate indifference to use of unreasonable force by correctional officers at Wright County Jail to when arresting inmates for alleged or actual conduct violations;

b. Wright County has a policy of only having a medical provider on site on Fridays;

c. Wright County has a policy and/or custom of refusing to transport inmates to off-site medical providers for medical treatment of injuries that are not deemed to be life-threatening;

d. Wright County has a policy of considering non-health-related grounds (e.g., cost of treatment, convenience, etc.) when considering whether to provide medical treatment to injured inmates;

e. MEnD Correctional Care has a custom of misdiagnosing or underdiagnosising the severity of physical injuries, and this custom can be imputed to the County since MEnD Correctional Care is acting as a municipal or quasi-municipal actor;

f. Wright County's policy is to outsource all in-house medical care at the Jail to MEnD Correctional Care; and

g. Wright County's official custom is to exhibit deliberate indifference to the Fourth and Fourteenth Amendment rights of inmates by: (i) failing to train correctional officers how to apply handcuffs in a manner that will not lead to great bodily injury, and (ii) failing to ensure that its third-

party medical providers are capable of and willing to provide constitutionally adequate medical care to inmates.

187.  The policies and customs noted above were a moving force behind Plaintiff's injuries.

188.  Wright County knew or constructively knew that Mend Correctional Care was unable or unwilling to provide constitutionally adequate medical care to inmates. *See generally* Brandon Stahl, et al., *KARE 11 Investigates: 'Unethical' Record of Minnesota's Largest Health Care Provider*, KARE 11 (updated Oct. 19, 2021)[1] (noting that Mend Correctional Care's owner, Dr. Leonard, is facing and has settled numerous lawsuits against the company alleging record falsification, inadequate care that led to preventable deaths and suffering, and hiring inexperienced and unqualified staff to work with inmates with significant medical needs); *see* Brandon Stahl, et al., *KARE 11 Investigates: Jail Medical Contract Awarded on Misleading Information*, KARE 11 (updated Oct. 29, 2021)[2] (noting: (1) Mend reached a $1.45 million settlement in in 2015 in regards to a wrongful death lawsuit from the family of a Stearns County inmate (Mend paid $850,000 of that amount); (2) after Hardel Sherell died in the Beltrami Coutny jail in 2018, a

---

[1] https://www.kare11.com/article/news/investigations/kare-11-investigates-unethical-record-of-minnesotas-largest-jail-health-care-provider/89-aed51ef6-ca37-4ace-b6d0-3e079389c9c9.

[2] https://www.kare11.com/article/news/investigations/kare-11-investigates-anoka-county-jail-mend-correctional-care-contract/89-fbec7088-8534-4b7f-b100-b129084d861e#:~:text=Minnesota's%20largest%20jail%20medical%20provider&text=Court%20records%20show%20there%20was,of%20that%20without%20acknowledging%20wrongdoing.

whistleblowing nurse filed complaints with the Minnesota Department of Corrections and the state Medical and Nursing Boards alleging neglectful care by jail staff and the jail doctor – Todd Leonard; (3) the Minnesota Board of Medical Practice publicly displined Dr. Leonard in 2011 for what it described as "unethical and unprofessional conduct, failure to maintain adequate medical records, and inappropriate prescribing practices"); and (4) Mend and Sherburne County Jail reached a $2.3 million settlement in December of 2020 after James Lynas died in custody); Kirsti Marohn, *MN Board Suspends Medical License of Jail Doctor*, MPR NEWS (Jan. 26, 2022)[3] ("In its Jan. 21 decision, the Minnesota Board of Medical Practice found that Leonard demonstrated a willful or careless disregard for the health, welfare or safety of the patient, whom it did not name." The Board has "suspended indefinitely" Dr. Todd's license to practice medicine).

189. Mend Correctional Care personnel were actively and constructively knowledgable of Jama's serious injury and pain, and continued to ignore or inadequately treat his injuries. This was at such an extreme degree that it constitutes at least a custom of Defendants, considering it was repeated refusals to adequately treat Jama's fracture.

190. Mend Correctional Care personnel have a custom to only medicate serious injuries, such as a fracture, with Ibuprofen or Tylenol rather than splinting or setting the fractured and migrated forearm. This custom is imputed to Wright

---

[3] https://www.mprnews.org/story/2022/01/26/board-suspends-medical-license-of-jail-doctor.

County. Numerous other inmates who have experienced injuries of equal severity to Jama's have encountered the same inadequate medical care.

191.    Wright County demonstrated deliberate indifference to the needs of its inmates' medical concerns by hiring a company to provide inmates with medical care that was headed by a doctor who was disciplined in 2011 for what the Minnesota Board of Medical Practice described as "unethical and professional conduct, failure to maintain adequate medical records, and inappropriate prescribing practices."

192.    On information and belief, other inmates have previously suffered substantial or great bodily injury through the handcuffs by correctional officers at Wright County Jail. Despite having knowledge of these injuries, Wright County has failed to train correctional officers how to apply handcuffs in a manner that does not cause injury, and has further tacitly authorized correctional officers to use excessive force by failing to discipline correctional officers when excessive force is used in the application of handcuffs. Wright County has still not provided relevant training to its correctional officers.

193.    On information and belief, other pretrial detainees and/or inmates at Wright County Jail and other jails across Minnesota have previously suffered substantial and unnecessary pain or suffering by being mistreated, underdiagnosed, or otherwise provided with inadequate medical care by Mend Correctional Care medical providers. Wright County has failed to supervise or train Mend

Correctional Care to ensure that they comply with the minimum requirements of the Constitution.

194.   "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Wright County's liability must attach because the imputed policies and customs themselves were unconstitutional.

195.   As a direct and proximate result of Defendants' actions, Plaintiff suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

## Count 5: Minn. Stat. § 466.02 – Battery

### (Plaintiff v. Wright County, Defendant Peterson, and Defendant Doe)

196.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

197.   Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

198.   Minnesota Law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

199.   Defendant Peterson and/or Defendant Doe committed such a battery when one of them unreasonable and forcibly slammed handcuffs with such force that caused a

fracturing of his arm, while he was lying down, obeying commands, and not resisting.

200. Because Defendant Peterson and/or Defendant Doe acted intentionally and with reason to believe that using such unnecessary force would cause serious damage, including fracturing and migration of bone, they are not entitled to official immunity.

201. Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." MINN. STAT. § 466.02. This is subject to several exceptions, none of which are applicable here.

202. Defendant Peterson and/or Defendant Doe failed to exercise due care when they fractured Jama's arm without cause.

203. As a direct and proximate result of Defendant Peterson's and/or Defendant Doe's actions, Jama suffered great bodily harm including but not limited to physical injury, financial injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

### Count 6: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Wright County, Defendant Peterson, and Defendant Doe)

204. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

205. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

206. By fracturing Jama's arm with handcuffs while complying with orders, lying down, C/O Does "fail[ed] to act as a reasonable and prudent [correctional] officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

207. Defendant Peterson and/or Defendant Doe owed Jama the duty of defusing the situation or, at the very least, apprehending him in a constitutionally reasonable manner.

208. Defendant Peterson and/or Defendant Doe owed Jama a duty to not unnecessarily harm him in the execution of his arrest or seizure.

209. Defendant Peterson and/or Defendant Doe owed Jama a duty to not break Jama's forearm while applying handcuffs.

210. Defendant Peterson and/or Defendant Doe breached these duties.

211. As a direct and proximate result of Defendant Peterson's and/or Defendant Doe's conduct, Jama's arm was fractured and his bones migrated.

212. As a direct and proximate result of Defendant Does' actions, Jama suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

**Count 7: Minn. Stat. § 466.02 –Negligent Infliction of Emotional Distress**

(Plaintiff v. Wright County, Defendant Peterson, and Defendant Doe)

213.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

214.   Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

215.   By fracturing Jama's arm with handcuffs while complying with orders, lying down, Defendant Peterson and/or Defendant Doe "fail[ed] to act as a reasonable and prudent [correctional] officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

216.   Aside from a claim of negligence, a plaintiff will prevail on a claim of negligent infliction of emotional distress if "[he] was within the zone of danger of physical impact [created by the defendant's negligence], reasonably feared for [his] own safety, and consequently suffered severe emotional distress with attendant physical manifestations." *Engler v. Illinois Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005) (internal citations omitted).

217.   Jama was within the zone of danger of physical impact because he was physically and severely injured when his arm was fractured as a result by one of the Defendant Officers.

218.   The injury Jama suffered was so severe as to cause Jama to defecate on himself, which caused Jama to experience embarrassment and humiliation in addition to the severe physical pain he was already experiencing.

219.   Defendant Peterson and/or Defendant Doe(s) and medical staff continuously ignored Jama's repeated requests for adequate medical care– instead leaving him

in solitary confinement for days with a migrated and fractured arm, not knowing whether he would be able to use his arm again due to the significantly delayed medical treatment.

220.   Therefore, Jama reasonably feared for his safety given the circumstances.

221.   On that day, Jama imploring C/O's and medical staff for adequate medical care, and repeatedly announcing the limited-to-no functionality of his arm and his sincere and accurate belief that his arm was fractured plainly showed the manifestations of his intense fear following the battery.

222.   Moreover, as a result of the injury, Jama was forced to remain in solitary confinement for a prolonged period of time once transferred to Sherburne County Jail because the cast he was medically required to wear could have been used as a weapon.

223.   Solitary confinement is known to lead to increased risk of anxiety, depression, suicidal thoughts, and psychosis. *See* Jayne Leonard, *What are the Effects of Solitary Confinement on Health?*, MEDICAL NEWS TODAY (Aug. 16, 2020)[4] (medically reviewed by Marney A. White, PhD, MS, Psychology).

224.   Solitary confinement is known to detrimentally affect physical health, increasing a person's risk for a range of conditions, including fractures, vision loss, and chronic pain. *Id.*

---

[4] https://www.medicalnewstoday.com/articles/solitary-confinement-effects.

225.   Jama experienced anxiety and depression while in solitary confinement between the time when his arm was broken and when he had his cast removed.

226.   Jama has been diagnosed by Sherburne County Jail with a Vitamin D deficiency. Part of this Vitamin D deficiency arises from Jama's solitary confinement, which was caused by Defendants' actions in breaking Jama's arm.

227.   As a direct and proximate result of Defendant Peterson's and/or Defendant Doe's and Mend Correctional Care Defendants' conduct, Jama suffered emotional trauma so severe that it resulted in physical manifestations of depression and anxiety (both of which affect numerous biomarkers in the brain and body, and which have physiological effects on physical health), and further resulted in a Vitamin D deficiency.

228.   As a direct and proximate result of Defendant Peterson's and/or Defendant Doe's and Mend Correctional Care Defendants' conduct, Jama suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, pain and suffering, and embarrassment and humiliation.

229.   Thus, Defendants committed an actionable negligent infliction of emotional distress tort under Minnesota law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    With regards to claims 1, 2, and 3 (§ 1983 claims), grant an award of compensatory and special damages in an amount to be determined at trial against one or more applicable Defendants as compensation for Defendants' actions which caused Jama to experience extreme pain and suffering, substantial emotional and psychological damages, substantial/great bodily harm, significant constitutional injuries, and embarrassment and humiliation. These damages are also necessary to obviate Jama's ongoing related costs and residual injuries and trauma resulting from Defendants' actions.

B.    With regard to claim 4 (§ 1983 *Monell* and *Canton* claims), grant an award of compensatory and special damages in an amount to be determined at trial against Defendant Wright County as compensation for Defendants' actions which caused Jama to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, significant constitutional injuries, and embarrassment and humiliation. These damages are also necessary to obviate Jama's ongoing related costs and residual injuries and trauma resulting from Defendant(s)' actions.

C.    With regards to claims 1, 2, and 3 (§ 1983 claims), grant an award of punitive damages in an amount to be determined at trial against applicable individual Defendants to punish their reckless and callous indifference towards Jama's rights under the U.S. Constitution and Minnesota law, and to deter other members of Wright County Jail and Mend Care from committing similar grievous offenses in the future.

D.      With regards to claims 1 through 4 (§1983 & *Monell* and *Canton* claims), grant an award of reasonable attorney's fees, non-taxable expenses and costs pursuant to 42 U.S.C. § 1988, or under any other relevant attorney fee statute.

E.      With regards to claims 5 through 7 (state law claims), grant an award of compensatory and special damages in an amount to be determined at trial against Defendant Peterson, Defendant Doe, Defendant Wright County (pursuant to MINN. STAT. § 466.02), or any combination thereof, as compensation for Defendants' actions which caused Jama to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, significant constitutional injuries, and embarrassment and humiliation. These damages are also necessary to obviate Jama's ongoing related costs and residual injuries and trauma resulting from Defendant(s)' actions.

F.      Grant such other relief as may be just and reasonable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: February 24, 2022          Respectfully submitted,

                                    /s/ *Nico Ratkowski*

                                    NICO RATKOWSKI
                                    MN Attorney ID: 0400413
                                    Contreras & Metelska, P.A.
                                    200 University Avenue W., STE 200
                                    Saint Paul, Minnesota 55103
                                    P: (651) 771-0019

F: (651) 772-4300
nico@contrerasmetelska.com

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and he believes same to be true, and he further states that the sources of this information and belief are documents provided to him by Plaintiff, Defendant(s), and third-party witnesses.

DATED: February 24, 2022                    Respectfully submitted,

/s/ *Nico Ratkowski*
Nico Ratkowski
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiff*